IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CARE SERVICES MANAGEMENT, LLC and MARQUIS HEALTH SYSTEMS, LLC, | )<br>)<br>)<br>) |
| Plaintiffs, | ) NO. 3:17-cv-01095 |
| v. | ) JUDGE CAMPBELL<br>) MAGISTRATE JUDGE FRENSLEY |
| PREMIER MOBILE DENTISTRY OF VA, LLC and MATTHEW DANIEL, | )<br>)<br>) |
| Defendants. | ) |

## MEMORANDUM

### I. INTRODUCTION

Pending before the Court are Defendants' Motion for Summary Judgment (Doc. No. 43), Plaintiffs' Response (Doc. No. 55), and Defendants' Reply (Doc. No. 63). For the reasons set forth below, Defendants' Motion is **GRANTED** in part, and **DENIED** in part. Defendants are granted summary judgment on all claims except Plaintiffs' claim for breach of contract against Defendant Premier Mobile Dentistry of VA, LLC, arising out of the termination of the parties' business relationship.

### II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Care Services Management, LLC ("CSM") and Marquis Health Systems, LLC ("MHS") have brought this action against Premier Mobile Dentistry of VA, LLC ("Premier"), and Matthew Daniel, raising the following claims: (1) tortious interference with a contractual relationship /inducement to breach of contract against Defendant Premier; (2) breach of contract against Defendant Daniel; (3) violation of the Tennessee Uniform Trade Secrets Act against both

Defendants; (4) conspiracy to misappropriate confidential information and trade secrets against both Defendants; (5) unfair competition against both Defendants; (6) breach of contract against Premier; and (7) violation of the Defend Trade Secrets Act of 2016 against both Defendants. (Doc. No. 1). The claims arise out a six-month business relationship between Plaintiffs and Defendant Premier, and the subsequent employment of Defendant Daniel by Premier.

The parties agree to the following facts, unless otherwise noted. CSM offers healthcare providers marketing, scheduling, logistic, and coordination services with nursing homes. (Plaintiffs' Response to Defendants' Statement of Undisputed Facts ¶ 3 (hereinafter "Plaintiffs' Response to Facts) (Doc. No. 55-5)). MHS submits reimbursement claims on behalf of healthcare providers for payment, and also works to collect payment from the payers. (*Id.* ¶¶ 4, 5).[1] CSM is paid for its services by receiving a percentage of the healthcare provider's claims each month. (*Id.* ¶ 6). MHS is paid for its services by charging a percentage of the collections it obtains from payers. (*Id.* ¶ 7). Mark Napper is the Chief Executive Officer of CSM and MHS. (*Id.* ¶ 1). Dr. Michael Rabel is the sole member of Premier, and Amie Rabel is the Vice President of Operations. (*Id.* ¶¶ 10, 11).

Mr. Napper's partner, Louis Lefebvre, introduced Mr. Napper to Dr. Rabel. (*Id.* ¶ 12). At the time, Mr. Napper's company, Marquis Mobile Dental Services, Inc., was servicing approximately 30 different long-term care facilities in Virginia. (*Id.* ¶ 13). After meeting Mr. Napper, Premier purchased two mobile dental units from CSM in 2016. (*Id.* ¶ 14). Although no written agreement was executed, Premier agreed with CSM and MHS to assume the contracts that

---

[1] In response to Defendants' Statement of Undisputed Facts, at Paragraphs 3, 4 and 5, Plaintiffs state: "Undisputed in part and disputed in part. See Declaration of MHS par. 14 and CSM par. 17." (Doc. No. 55-5 ¶¶ 3-5). Plaintiffs have failed to explain which "parts" of the statements of fact they dispute, and a review of the referenced citation has not made the dispute apparent. Therefore, the Court deems the facts admitted.

Marquis Mobile had in Virginia, and to pay CSM 12% of Premier's monthly production and MHS 8% of Premier's monthly collections. (*Id.* ¶ 15). The relationship between Premier and CSM/MHS began in January 2017. (*Id.* ¶¶ 16, 17). The relationship ended on June 26, 2017. (Defendants' Response to Plaintiffs' Additional Statement of Undisputed Facts ¶ 5 (hereinafter "Defendants' Response to Facts") (Doc. No. 64)). The parties dispute the facts surrounding the termination of their relationship. (Plaintiffs' Response to Facts ¶¶ 18-21).

Matthew Daniel was previously employed by MHS as a bill collector, and later, as a supervisor of MHS billers and collectors. (*Id.* ¶¶ 8, 9). While working at MHS, Mr. Daniel executed a non-compete agreement, which states:

> In consideration of Employees' employment by the Company, including appointment to their position and additional financial benefits conferred on them by their employment by the Company, during the Employees (sic) employment, and for a period of two (2) years after cessation (for any reason) of employment by the Company, Employee will not, at any time, directly or indirectly, individually or on behalf of others: (a) compete with the Company within any state having customers of the Company that collectively make up more than two percent (2%) of the Company's annual revenues; . . .

(*Id.* ¶¶ 37, 38; Doc. No. 45-1, at 5). Mr. Daniel was hired by Premier on July 14, 2017, working as a scheduler. (*Id.* ¶¶ 46, 47). Mr. Daniel has not performed any billing services at Premier. (*Id.* ¶ 48). The parties agree that the reference to the Company's two percent annual revenue means the total revenue of MHS. (*Id.* ¶ 39). MHS no longer services any nursing homes in Virginia. (*Id.* ¶¶ 41, 49).

While employed at MHS, Mr. Daniel was also subject to a confidentiality agreement. (Defendants' Response to Facts ¶ 15; Doc. No. 45-1, at 4). Before his departure, Mr. Daniel emailed several documents from his work account to his personal account. (Plaintiffs' Response to Facts ¶ 23). The parties agree as to the specific documents emailed, but disagree as to whether

3

those documents are trade secrets or are otherwise kept confidential. (*Id.* ¶¶ 24-26). The parties do agree, however, that each document Mr. Daniel emailed to himself was already available to both Premier and the patient involved. (*Id.* ¶¶ 27-28).

After Mr. Daniel emailed the documents to his personal email account, Tim Meredith, the Chief Information Officer at CSM and MHS, remotely accessed Mr. Daniel's work laptop and deleted each forwarded email. (*Id.* ¶¶ 42-44). Premier has never received from Mr. Daniel, nor has it used, any documents Mr. Daniel emailed from his work account to his personal email account. (*Id.* ¶ 50).

## III. ANALYSIS

### A. The Standards Governing Motions for Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has construed Rule 56 to "mandate[] the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v.* Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, a court must draw all reasonable inferences in favor of the nonmoving party. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986); *Shreve v. Franklin County, Ohio,* 743 F.3d 126, 132 (6th Cir. 2014). The court does not, however, make credibility determinations, weigh the evidence, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

4

In order to defeat the motion, the nonmoving party must provide evidence, beyond the pleadings, upon which a reasonable jury could return a verdict in its favor. *Celotex Corp.*, 477 U.S. at 324; *Shreve,* 743 F.3d at 132. Ultimately, the court is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

### B. Tennessee Uniform Trade Secrets Act and Defend Trade Secrets Act

Defendants argue they are entitled to summary judgment on Plaintiffs' claims under the Tennessee Uniform Trade Secrets Act ("TUTSA"), Tenn. Code Ann. §§ 47-25-1701, *et seq.,* and the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.* Defendants argue that the information upon which Plaintiffs base their claims under TUTSA and DTSA does not qualify as "trade secrets."

TUTSA defines "trade secrets" as follows:

(4) 'Trade secret' means information, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan that:

  (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and

  (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Tenn. Code Ann. § 47-25-1702(4). DTSA's definition is very similar, defining "trade secrets" as follows:

(3) the term 'trade secret' means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or

5

intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

    (A) the owner thereof has taken reasonable measures to keep such information secret; and

    (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C. § 1839(3).

The parties agree the documents Plaintiffs claim qualify as "trade secrets" are attached as Exhibit 1 to Defendants' Motion for Summary Judgment. (Defendants' Response to Facts ¶ 9).[2] The exhibit is approximately 195 pages long and consists of documents relating to providing and receiving payment for dental treatment, including transmittal letters, emails, spreadsheets, invoices, dental progress notes, standing orders, memos, consent for dental treatment, and similar documents. (Doc. No. 45-1, at 9-204). Most, if not all, of the documents include particular patient information.

Regarding these documents, the parties agree the "medical consent form" is part of the patient's medical record. (*Id.* ¶ 29). The "medical formatting" document compiled by CSM for nursing home patients was sent to each long-term care facility where the patient resided. (*Id.* ¶¶ 30, 31). CSM's "liability worksheet" contains information as to how the patient will pay for the dental services provided, and is generated in conjunction with a third party – the nursing home's business office manager. (*Id.* ¶¶ 32-33). When MHS submitted claims for reimbursement in

---

[2] On the Court's electronic docketing system, Defendants have labeled a 204-page document as "Exhibit 1." (Doc. No. 45-1). Within that document, Defendants have also labeled a "Confidentiality and Nondisclosure Agreement" as Exhibit 1. (Doc. No. 45-1, at 1-8). Labeled as Exhibits 2 through 25 within the document are over 190 pages of various other documents. (Doc. No. 45-1, at 9-204). These documents are apparently what the parties are referring to as Exhibit 1. The Court will do so as well.

6

Virginia, it sent the claim documentation to the nursing home where the patient resided, and the nursing home sent the claim to the appropriate state agency. (*Id.* ¶ 35). If the agency rejected the claim, the basis for the rejection was conveyed to the nursing home's business office manager, who conveyed the basis for the rejection to MHS. (*Id.* ¶ 36).

Plaintiffs contend the forms or templates for these documents are "trade secrets" within the meaning of TUTSA and DTSA because they are the result of their work in assimilating and integrating information needed for the efficient payment of dental claims. Plaintiffs also argue they have taken reasonable measures to protect the forms/templates by keeping them on a secure server, and by requiring dental providers to sign a confidentiality provision. As discussed above, however, Plaintiffs admit that all the forms/templates Mr. Daniel e-mailed to himself in Exhibit 1 were already available to both the patient and Premier. In addition, and as discussed above, Plaintiffs admit that most, if not all, of the forms/templates are also available to nursing homes and the reimbursing state agency. Indeed, Plaintiffs have not identified any form/template in Exhibit 1 that is *not* regularly shared with the patient, a nursing home, the reimbursing state agency, or some other individual outside their company. Under these circumstances, Plaintiffs have failed to establish the information is "not readily ascertainable through proper means," or that they have taken "reasonable" measures to keep the information secret. *See, e.g., Smart & Assocs., LLC v. Indep. Liquor (NZ) Ltd.,* 226 F. Supp. 3d 828, 857 (W.D. Ky. 2016) (concluding that plaintiff's customer lists and financial information did not qualify as "trade secrets" because plaintiff disclosed the information during a presentation to defendants before requiring them to execute a confidentiality agreement); *Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 795 (W.D. Ky. 2001) (concluding that plaintiffs' actions in sharing pilot episodes of their proposed cable program to various players in the cable industry proved the episodes were not "trade secrets"

because they were readily ascertainable through proper means); *see also ECIMOS, LLC v. Carrier Corp.,* 971 F.3d 616, 643 (6th Cir. 2020) (holding that plaintiff failed to establish its assembled hardware was a "trade secret" because it voluntarily disclosed it to third parties by selling it as a product.)

As to Plaintiffs' argument regarding the secure server and confidentiality agreements, they have cited no authority indicating documents shared with third parties become "trade secrets" simply because they are kept on a secure server, or because employees or others agree not to disclose them. Thus, Plaintiffs have not created a genuine issue of material fact that the forms/templates in Exhibit 1 qualify as "trade secrets" under TUTSA or DTSA.[3] Accordingly, Defendants are entitled to summary judgment on these claims.

## C. Breach of Contract by Defendant Daniel

Under Tennessee law, the essential elements of a breach of contract claim are: (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of the contract; and (3) damages caused by the breach of contract. *C&W Asset Acquisition, LLC v. Oggs*, 230 S.W.3d 671, 676 (Tenn. Ct. App. 2007); *Life Care Ctrs. of Am., Inc. v. Charles Town Assocs. Ltd. Partnership*, 79 F.3d 496, 513 (6th Cir. 1996). A cardinal rule of contract interpretation is to give effect to the intent of the parties. *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006). The court is to "look to the plain meaning of the words in the document to ascertain the parties' intent." *Id.* The contract is to be interpreted "according to its plain terms as written, and the

---

[3] Plaintiffs cite *Hamilton-Rykker Group, LLC v. Keymon,* 2010 WL 323057, at *13-15 (Tenn. Ct. App. Jan. 28, 2010), and *Wright Medical Technology, Inc. v. Grisoni,* 135 S.W.3d 561, 589-90 (Tenn. Ct. App. 2001), to support their argument that integration and aggregation of data can qualify as a "trade secret." In neither of these cases, however, was the information at issue intentionally shared with third parties.

8

language used is taken in its 'plain, ordinary, and popular sense.'" *Crye-Leike, Inc. v. Carver*, 415 S.W.3d 808, 816 (Tenn. Ct. App. 2011) (quoting *Bob Parsall Motor, Inc., v. Regal Chrysler – Plymouth, Inc.,* 521 S.W.3d 578, 580 (Tenn. 1975)).

As noted above, Mr. Daniel was subject to a non-compete agreement when he was employed with MHS. The agreement provides that he may not compete with MHS "within any state having customers of [MHS] that collectively make up more than two percent (2%) of [MHS's] annual revenues." (Doc. No. 45-1, at 5). Plaintiffs allege Mr. Daniel violated this agreement through his employment with Premier. Plaintiffs have not directed the Court to any evidence in the record, however, that MHS's annual revenues in Virginia meets the "two percent" condition of the agreement. *See, e.g., Shorts v. Bartholomew*, 255 Fed. Appx. 46, 50 (6th Cir. 2007) ("[W]e need not scour the record or make a case for a party who has failed to do so on his own behalf . . . "). In addition, Plaintiffs have not attempted to show Mr. Daniel's work at Premier as a scheduler was such that he "competed" with MHS's collection business in violation of the non-compete agreement. (Deposition of Mark Napper, at 146 ("Q. Do you know if [Mr. Daniel] worked in competition with Marquis and doing billing services [at Premier]? A. I do not.")). By failing to cite factual support, Plaintiffs fail to satisfy their burden of providing evidence, beyond the pleadings, upon which a reasonable jury could return a verdict in their favor on their claim for breach of the non-compete agreement. *See Celotex Corp.*, 477 U.S. at 324; *Shreve,* 743 F.3d at 132.

Plaintiffs also allege Mr. Daniel breached his confidentiality agreement with MHS. The confidentiality agreement prohibits the disclosure of "trade secrets" or "confidential or proprietary information." (Doc. No. 45-1, at 5). The agreement's definition of "trade secret" is substantially similar to the TUTSA definition:

9

> 'Trade secret' means any technical or non-technical data, formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, financial plan, product plan, list of actual or potential customers or suppliers, or other information similar to any of the foregoing, which derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by other persons who can derive economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

(Doc. No. 45-1, at 4). The term "confidential information" is somewhat broader:

> 'Confidential Information' means data or information, other than Trade Secrets, that is valuable to the Company or to any person or entity that is represented by, that is affiliated with, or that does business with the Company, including but not limited to information regarding patients of customers, and that is considered by the Company to be secret, confidential, proprietary, and that is not generally known to the public or competing businesses.

(Doc. No. 45-1, at 4).

As the Court explained above, the information allegedly disclosed by Mr. Daniel does not constitute "trade secrets" under TUTSA and DTSA because Plaintiffs have intentionally shared the information with third parties. As the definition of "trade secrets" in the agreement is substantially similar in material respects to the TUTSA/DTSA definitions, Plaintiffs have not established that Mr. Daniel's disclosure of the information violated the "trade secrets" provision. Plaintiffs' disclosure of the information to third parties also indicates MHS did not consider the information "to be secret, confidential, or proprietary," and therefore, Plaintiffs have not shown Mr. Daniel shared "confidential information" as defined in the agreement. Thus, Plaintiffs have failed to create a genuine issue of material fact regarding Mr. Daniel's alleged breach of the confidentiality agreement, and Mr. Daniel is entitled to summary judgment on that claim.

### D. **Tortious Interference with Contractual Relationship/Inducement to Breach of Contract**[4]

In order to establish a claim for common law or statutory inducement to breach a contract, the plaintiff must prove: (1) a legal contract existed; (2) the defendant was aware of the contract; (3) the defendant intended to induce a breach of contract; (4) the defendant acted with malice; (5) a breach of the contract occurred; (6) the breach was a proximate result of the defendant's conduct; and (7) the breach injured the plaintiff. *JIT Concepts, Inc. v. Shelby Cty. Healthcare Corp.*, 358 F. Supp. 2d 678, 686 (W.D. Tenn. 2005); *Whalen v. Bourgeois*, 2014 WL 2949500, at *10 (Tenn. Ct. App. June 27, 2014).

Plaintiffs allege Premier induced Mr. Daniel to violate his non-compete and confidentiality agreements. For the reasons explained above, however, Plaintiffs have failed to create a genuine issue of material facts that a breach of the agreements occurred, as required by the fifth element listed above. Therefore, Premier is entitled to summary judgment on the inducement to breach a contract claim.

In order to establish the tort of intentional (tortious) interference with business relationships[5] under Tennessee law, a plaintiff must prove the following: (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach

---

[4] In the Complaint, Plaintiffs allege a cause of action for "Tortious Interference with a Contractual Relationship as to Premier/Inducement to Breach Contract." (Doc. No. 1, at 7). In their response brief, Plaintiffs cite the statutory remedy for inducement to breach of contract, Tennessee Code Annotated Section 47-50-109, though the statute is not cited in the Complaint. For the reasons explained above, the Court's analysis regarding the common law and statutory claims is the same.

[5] Although Plaintiffs use a somewhat different name for this tort in their Complaint, they list these same elements in their brief. (Doc. No. 55, at 19).

11

or termination of the business relationship; (4) the defendant's improper motive or improper means; and (5) damages resulting from the tortious interference. *Trau-Med of America, Inc. v. Allstate Ins. Co.,* 71 S.W.3d 691, 701 (Tenn. 2002).

Plaintiffs appear to allege in their Complaint that the "business relationship" Premier sought to terminate was Mr. Daniel's employment relationship with MHS. Defendants argue Plaintiffs have failed to come forward with evidence regarding the fifth element – damages from the tortious interference – because Mr. Napper testified in his deposition that he is not seeking any damages for Premier's employment of Mr. Daniel. (Doc. No. 47-1, at 255-56). In discussing this claim, Plaintiffs' brief refers to damages for alleged misappropriation of trade secrets, but it does not cite to any evidence in the record as to damages resulting from the termination of Mr. Daniel's employment. Therefore, Plaintiffs have not created a genuine issue of material fact regarding the element of damages, and Premier is entitled to summary judgment on this claim.

### E. Civil Conspiracy to Misappropriate Confidential Information and Trade Secrets

To establish a civil conspiracy, a plaintiff must show: (1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury. *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006); *Pagliara v. Moses*, 2020 WL 838482, at *6 (Tenn. Ct. App. Feb. 20, 2020). A claim for civil conspiracy "requires an underlying predicate tort allegedly committed pursuant to the conspiracy." *Watson's Carpet & Floor Coverings, Inc. v. McCormick,* 247 S.W.3d 169, 180 (Tenn. Ct. App. 2007); *Pagliara* 2020 WL 838482, at *6. A claim of conspiracy, standing alone, is not actionable where the underlying tort is not actionable. *Lane v. Becker*, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010).

Defendants argue the underlying tort alleged here – misappropriation of trade secrets – is not actionable because it has been preempted by TUTSA. Plaintiffs have not addressed the preemption argument. TUTSA provides that, with certain exceptions not applicable here, the statute "displaces conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." Tenn. Code Ann. § 47-25-1708(a). In applying this provision, courts have adopted what has been termed as the "same proof test." *See Hauck Manufacturing Co. v. Astec Industries, Inc.,* 375 F. Supp. 2d 649 (E.D. Tenn. 2004); *Cardinal Health 414, Inc. v. Adams*, 582 F. Supp. 2d 967, 985 (M.D. Tenn. 2008); *RN Entm't, LLC v. Clement*, 380 F. Supp. 3d 711, 719-20 (M.D. Tenn. 2019). Under the "same proof test:"

> [A] claim will be preempted when it necessarily rises or falls based on whether the defendant is found to have 'misappropriated' a 'trade secret' as those two terms are defined in the UTSA. Stated another way, if proof of a non–UTSA claim would also simultaneously establish a claim for misappropriation of trade secrets, it is preempted irrespective of whatever surplus elements or proof were necessary to establish it.

*Hauck*, 375 F. Supp. 2d at 658.

Applying the "same proof test" here, the Court concludes that the same evidence establishing the tort claim for "misappropriation of trade secrets" would also establish a claim for violation of TUTSA. Indeed, the Complaint alleges the same operative facts to support both claims. (Doc. No. 1 ¶¶ 42-60). Thus, Plaintiffs' claim for misappropriation of trade secrets is preempted by TUTSA. Even if the claim were not preempted, however, Plaintiffs have not created a genuine issue of material fact that the information allegedly misappropriated qualifies as "trade secrets" or "confidential information" given that the information has been shared with third parties. As the underlying tort claim of misappropriation is not actionable under either scenario, Defendants are entitled to summary judgment on Plaintiffs' civil conspiracy claim.

13

**F. Unfair Competition**

"Unfair competition is a broad term encompassing several related torts involving improper interference with business prospects." *J.T. Shannon Lumber Co. v. Barrett*, 2010 WL 3069818, at *13 (W.D. Tenn. Aug. 4, 2010). As with civil conspiracy, a claim of unfair competition requires an underlying tort. *Dominion Enterprises v. Dataium, LLC*, 2013 WL 6858266, at *7 (Tenn. Ct. App. Dec. 27, 2013). In order to establish a claim of unfair competition, a plaintiff must show: (1) the defendant engaged in conduct that amounts to a recognized tort and (2) that tort deprives the plaintiff of customers or other prospects. *RN Entm't, LLC v. Clement*, 380 F. Supp. 3d at 721 (citing *B & L Corp. v. Thomas & Thorngren, Inc.,* 162 S.W.3d 189, 216 (Tenn. Ct. App. 2004)).

The Complaint asserts a claim for "unfair competition" based on Defendants allegedly "engag[ing] in conduct that is contrary to the honest practice in industrial or commercial matters" that was "intentionally designed to gain an unfair competitive advantage by causing harm to the ability of Plaintiffs to compete in an open and fair market place." (Doc. No. 1, at 15-16). The Complaint does not otherwise identify the underlying torts asserted. In their brief, Plaintiffs identify the torts underlying the unfair competition claim as misappropriation of trade secrets and confidential information and inducement to breach of contract. (Doc. No. 55, at 21). As explained above, Plaintiffs' claim for misappropriation of trade secrets fails because it is pre-empted by TUTSA, and because the information at issue does not qualify as a "trade secret" or "confidential information." Also, for the reasons described above, Plaintiffs' inducement to breach a contract claim fails because Plaintiffs have not shown Mr. Daniel violated his non-compete and confidentiality agreements. Thus, the torts underlying Plaintiffs' unfair competition claim are not actionable, and therefore, Defendants are entitled to summary judgment on the claim.

14

### G. Breach of Contract as to Premier

As discussed above, the parties agree that Premier and MHS/CSM entered into an oral agreement in January 2017, through which Premier agreed to pay MHS and CSM for services they provided. Plaintiffs allege Premier has violated that agreement, and has failed to pay the fees they are owed. Defendants argue Premier is entitled to summary judgment on this claim because Plaintiffs released Premier from liability and waived any accrued cause of action.

Waiver is the relinquishment by a party of a known right. *Crye-Leike, Inc. v. Carver*, 415 S.W.3d at 821. "'[W]aiver is proven by a clear, unequivocal and decisive act of the party, showing a purpose to forgo the right or benefit which is waived.'" *Id.; GuestHouse Intern., LLC v. Shoney's N. Am. Corp.,* 330 S.W.3d 166, 202 (Tenn.Ct.App.2010). The party asserting waiver has the burden of proving it by a preponderance of the evidence. *Id.*

Defendants base their release/waiver argument on a text sent by Mr. Napper to Dr. Rabel on June 26, 2017, which states:

> I agree to hold the majority of my income and this is the response I get. I feel like we are doing all we can despite some of the things that have been done to slow our progress. I will offer if you want your 2 units and 80 homes without CSM and MHS (sic) I would be willing to discontinue our services if you choose.

(Doc. No. 47-1, at 36). In a Declaration, Mr. Napper states that, in sending the text message, his intent was for the parties to discontinue their relationship, but not to "release" Premier from paying amounts owed to MHS/CSM. (Declaration of Mark Napper ¶¶ 2, 3 (Doc. No. 55-1)).

The Court is not persuaded that the language of the text message rises to the level of a clear, unequivocal, and decisive act by Mr. Napper to relinquish the right of MHS and CSM to receive funds for services rendered before the date of the text. Premier's own follow-up communication suggests otherwise. In a letter to Mr. Napper dated July 6, 2017, Dr. Rabel points

15

out the need for "a final accounting" as a result of the termination, and states: "[o]bviously, CMS and MHS will want to be paid for the services they provided . . ." (Doc. No. 47-1, 35). Defendants' waiver argument fails, and summary judgment is denied as to Plaintiffs' breach of contract claim against Premier.

Plaintiffs' brief also appears to assert a claim against Premier for breach of an "oral confidentiality agreement," which purportedly governed Premier's handling of Plaintiffs' confidential information. The allegations in the Complaint relating to Plaintiffs' breach of contract claim against Premier, however, do not include any reference to the breach of an oral confidentiality agreement. Plaintiffs have not amended their Complaint to raise such a claim, and they may not raise such a claim through a brief in response to a motion for summary judgment.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (Doc. No. 43) is **GRANTED** in part, and **DENIED** in part. Defendants are granted summary judgment on all claims except Plaintiffs' claim for breach of contract against Premier arising out of the termination of the parties' business relationship.

An appropriate Order shall enter.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE